```
                  UNITED STATES DISTRICT COURT
                     DISTRICT OF MINNESOTA
                      08-CV-4725(JMR/RLE)
```

| | |
|---|---|
| Green Meadow Bean Co. | ) |
| | ) |
| v. | ) FINDINGS OF FACT, |
| | ) CONCLUSIONS OF LAW, AND |
| Nationwide Agribusiness | ) ORDER FOR JUDGMENT |
| Insurance Co. | ) |

A trial on the merits was conducted by the Court without a jury. Having considered each party's evidence, exhibits, and arguments of counsel, the Court enters its Findings of Fact, Conclusions of Law, and Order for Judgment, pursuant to Rule 52(a)(1), Federal Rules of Civil Procedure.

I. <u>Findings of Fact</u>

Plaintiff, Green Meadow Bean Company ("Green Meadow"), purchases, stores, and sells edible dark red kidney beans at three sites in northwestern Minnesota. Green Meadow is owned by Thomas and Emily Chisholm. In 2004, Thomas Chisholm contacted Charlie Blixt, an insurance agent for defendant, Nationwide Agribusiness Insurance Company ("Nationwide"). After talking with Mr. Blixt, Mr. Chisholm purchased a comprehensive insurance policy for Green Meadow which, among other things, protected it in the event of equipment breakdown. This matter arises from the denial of Green Meadow's claim for coverage under that policy.

Nationwide's policy, some 300 pages in length, provides comprehensive general liability coverage, property damage coverage, and umbrella coverage for each Green Meadow location. Green Meadow

paid policy premiums of $45,000 in both 2004 and 2005. Nationwide reduced these premiums to $21,322 in 2006, because there had been no claims made under the policy. (Ex.[1] 14 at NAI-0337.) The policy requires monthly reports from Green Meadow of its quantity of "stock," thus giving Nationwide a current accounting of the beans in storage. Green Meadow has always complied with this requirement.

Mr. Chisholm testified to discussing insuring Green Meadow's equipment with Mr. Blixt. He stated Mr. Blixt assured him the equipment breakdown endorsement covered unusual business losses if a grain elevator's mechanical or electrical equipment broke down. It was Mr. Chisholm's understanding from this conversation that the policy provided coverage if an electric motor broke down.

In the spring of 2005, Green Meadow purchased beans from local growers, and when the fall harvest came in, it stored them for delivery to an Arkansas cannery. Beans are measured and traded in hundredweights. At trial, Green Meadow offered examples of its grower and canning contracts. These contracts showed Green Meadow purchased the beans for $25, and contracted to sell them for $27, yielding an expected $2 per hundredweight profit.[2]

Mr. Chisholm testified that stored kidney beans require

---

[1] "Ex." refers to exhibits received in evidence at trial.

[2] Mr. Chisholm testified Green Meadow contracted with the canning company once a year. The actual 2006 contract appears to have been lost. However, identical contracts for other years were received in evidence, and Mr. Chisholm testified the same contract form was used for 2006.

2

constant ventilation, especially during the spring warmup. To ensure ventilation, each storage silo is equipped with a false floor which allows air circulation. Ventilation holes are cut on opposite sides of the silo below this floor. Two centrifugal fans are placed, one at each opening, to aerate the silo. The fans pressurize the silo, forcing moving air to penetrate the mass of beans. If a fan fails, air pressure drops and the air simply exits the opposite ventilation hole. Silo aeration fans are powered by electrical motors controlled by a toggle switch. Green Meadow employees regularly inspect the silos to make sure the fans are working.

In the spring of 2006, one of the fans on silo E-5 stopped working. The silo had been filled with beans in the fall of 2005, and had been partially emptied, beginning in mid-January, 2006. On April 20 and 24, 2006, Green Meadow employees noticed the fan had shut off, but were able to restart it by resetting its switch. On the morning of May 17, 2006, the fan would not restart. By 8:00 a.m. that day, Green Meadow employees removed the fan and replaced it with one that worked.

The very same day, Emily Chisholm took the broken fan to Chuck's Motor Rewind in Mahnomen, Minnesota. Chuck Kochmann has owned Chuck's Motor Rewind for 32 years. During that time, he has become experienced in electrical equipment repair, and has worked with Green Meadow since it opened. Mrs. Chisholm left the fan with

3

Mr. Kochmann.

The next day, beans were drawn from the silo. A Green Meadow employee noticed an odor at the time. The odor was noted again on May 20, and again on May 26, the next time beans were unloaded. By June 7, the silo's remaining beans – later measured at 6,273.39 hundredweight - had spoiled. Mr. Chisholm and his employees cut holes in the silo's sides to see if any beans could be salvaged, but they had all spoiled. It ultimately took a five-man crew 17 days to clean out the silo using pickaxes, jackhammers, and explosives. Green Meadow paid to dispose of the spoiled beans at a landfill. Having lost more than 6,000 hundredweight of beans, and being obligated to deliver beans to the Arkansas cannery, Green Meadow had to purchase beans on the spot market to fulfill its contract.

As set forth in a detailed proof of claim form, Green Meadow suffered a loss totaling $187,285.70. At trial, Mr. Chisholm testified to the calculations which generated this figure and offered documentation in support thereof. (<u>See</u> Exs. 52, 53, 63-71.)

At the time of the loss, kidney beans were selling for $21 per hundredweight. Thus, the 6273.39 hundredweight of kidney beans had a replacement cost of $134,942.38. Because Green Meadow had paid a higher market price in its 2005 contract with the grower, the beans had an actual cash value of $156,909.75 (reflecting $25 per

4

hundredweight). Having had already sold the red kidney beans to the cannery, Green Meadow had to purchase beans to cover its contract, losing $12,546.78 in business income (reflecting a profit of $2 per hundredweight over the original purchase price).

Beyond this, Green Meadow spent $18,829.17 to remove the spoiled beans and repair the silo for the next harvest. These costs included $1,350 to rent a mechanical grain evacuator; $10,200 in labor costs (five employees at $15 per hour for 17 days); $4,029.17 in fuel costs to run the grain evacuator and transport the beans to the landfill; and $3,250 in landfill fees.

Thus, Mr. Chisholm added the actual cash value of the beans ($156,909.75), plus the lost income from the sale of the beans ($12,546.78), plus the full cost of repair ($18,829.17), minus the policy deductible ($1,000), to arrive at the $187,285.70 sum.

Nationwide has never disputed the amount of Green Meadow's loss, nor has it sought loss appraisals available to it under its policy. It does not challenge the conclusion that a fan failure on the E-5 silo caused the beans to spoil, nor does it suggest fraud or bad faith on Green Meadow's part.

Meanwhile, on June 22, Mr. Kochmann repaired the E-5 silo fan.[3] At trial, Mr. Kochmann testified he followed his regular practice, which was to test the motor. The motor would not start.

---

[3] Mr. Kochmann testified that he had a four to six-week backlog of work at the time.

He then took the fan apart and cleaned it and determined the contactor[4] had burned out, which in his view probably caused the fan to stop working. Mr. Kochmann stated that at least one set of the fan's contactor points had broken off, and it was falling apart. He removed the contactor and installed a new one. Once the contactor was replaced, the fan worked. Mr. Kochmann then cleaned the fan and replaced other parts, including the bearings, as a matter of preventive maintenance. Mr. Kochmann's usual practice for established customers such as Green Meadow was to discard broken parts; as a result, the contactor was discarded. The repair costs are reflected on Mr. Kochmann's invoice (Ex. 54).

More than a month after Mrs. Chisholm brought the fan to Mr. Kochmann, a Green Meadow employee, Kelvin Dalby, brought in two more fans for routine maintenance, and picked up the repaired fan. During this visit, Mr. Dalby may have mentioned a possible insurance claim, but by that time, the broken contactor had already been discarded. On June 23, 2006, a full month after the fan stopped working and the odor was detected, and after speaking with Mr. Blixt, Mr. Chisholm gave notice of the presently-contested insurance claim on behalf of Green Meadow.

On June 26, Nationwide's commercial claims specialist, Randy Mehrer, inspected silo E-5 and took photographs, which were entered

---

[4] A contactor is a device which allows electric current to run from its source to the motor at the tap of a switch.

into evidence. On July 5, Jonathan Mattson, a consultant hired on behalf of The Hartford Steam Boiler Inspection & Insurance Co. ("Hartford Steam"), came out to investigate. He, too, took photographs which were entered into evidence. Hartford Steam underwrites Nationwide's equipment breakdown coverage. All parties agree Green Meadow gave Mr. Mehrer and Mr. Mattson everything they requested and access to everything they sought, from a reconstructed timeline, to supporting documents, to samples of the spoiled beans – excepting only the broken contactor, thrown away by Mr. Kochmann. At his visit, and later by email, Mr. Mattson asked the Chisholms to obtain the contactor. On July 10, Emily Chisholm notified Mr. Mattson by fax that Green Meadow had tried to obtain the broken fan parts but they were already "in the landfill." (Ex. 4.)

Mr. Kochmann repaired several fans for Green Meadow that spring. This led to confusion as to which fan had caused the problem, and to a denial of Green Meadow's claim. The Chisholms twice asked for reconsideration. One request, dated August 14, 2006, appears on a fax attaching the repair invoice for the silo E-5 fan. Mr. Chisholm wrote, "This is the fan that had mechanical problems which caused my beans to go out of condition." (Ex. 5.) Eventually the parties correctly identified the fan which failed, and the confusion cleared up. The Court affords no weight to Nationwide's initial denial of Green Meadow's claim.

The Court finds the fan's contactor was broken. Mr. Kochmann testified he tried to start the fan before beginning his repair. He plugged it in and the motor did not power up. From this, he concluded the contactor failed. Unlike the fan bearings replaced whenever Mr. Kochmann opens a fan, the contactor was not routinely replaced as part of preventive maintenance. Mr. Mattson, Hartford Steam's adjuster, spoke with Mr. Kochmann, who confirmed the fan was not working when it arrived at the shop due to a broken contactor. Mr. Mattson did not believe Mr. Kochmann and, because the contactor had been discarded, denied Green Meadow's claim.

Mr. Mattson and another Nationwide witness, Matt Westphalen, opined that the two April 2006 fan stoppages evidence normal wear and tear. Their opinions in this regard are rejected, because neither witness was offered or qualified at trial as an expert in mechanical or electrical motors.[5] Their testimony did not conform with recognized standards set forth by the U.S. Supreme Court in

---

[5] Mr. Mattson was disclosed in pre-trial documents as an expert, but was never proffered to the Court as an expert; his only reports in evidence were written in connection with evaluating and denying Green Meadow's claim. His curriculum vitae reflects an A.S. Degree in engineering and a B.A. in Finance and Economics, as well as extensive experience in investigating insurance claims; there is no indication he has specific training or experience with the workings of electrical fans or motors or with crop-preservation methods and equipment. The essence of his testimony was that, in the absence of an ability to inspect the broken contactor, he could not find it failed in a manner which afforded insurance coverage. This is not a question on which expert testimony is particularly enlightening. It is also fair to say that the Court prefers outside experts - even when proffered as experts - to employees of interested parties.

Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 589-90 (1993). This leaves the Court with their lay opinions that two occasions of fan stoppage are evidence of wear and tear. Such opinions are afforded little weight.

II. Conclusions of Law

The parties agree Minnesota law governs this insurance policy. Under Minnesota law, an insurance policy is a contract subject to familiar rules of contract construction. The policy is construed as a whole. Unambiguous language is given its plain and ordinary meaning. Hubred v. Control Data Corp., 442 N.W.2d 308, 310-11 (Minn. 1989). Ambiguity is construed in favor of the insured. Id. at 310. Coverage exclusions are read narrowly against the insurer, which bears the burden of proving they apply. Id.

Contract ambiguity is a question of law. See Current Technology Concepts, Inc. v. Irie Enterprises, Inc., 530 N.W.2d 539, 543 (Minn. 1995). In making this determination, a court gives contract language its plain and ordinary meaning, interpreting the contract so all provisions have meaning. Id. If contract language is "reasonably susceptible of more than one interpretation," it is ambiguous, and must be construed against its drafter. Id.

Regardless of whether policy language is ambiguous, the Court may also consider the reasonable expectations of the insured. The Minnesota Supreme Court has recognized a "great disparity in bargaining power between insurance companies and those who seek

insurance," such that "people purchase insurance relying on others, the agent or company, to provide a policy that meets their needs." Atwater Creamery Co. v. Western Nat'l Mut. Ins. Co., 366 N.W.2d 271, 277 (Minn. 1985). Accordingly, Minnesota has adopted the reasonable-expectations doctrine, holding "the objectively reasonable expectations of applicants and intended beneficiaries regarding the terms of insurance contracts will be honored even though painstaking study of the policy provisions would have negated those expectations." Id. at 277 (citation and quotation omitted). The doctrine applies even if the policy language is not ambiguous. See id. at 277-278.

Defendant argues, first, the policy excludes claims for "wear and tear" and "stock going out of condition." The Court does not agree. As to property and stock, the policy is an all-risk policy, meaning all risks are covered unless specifically excluded.[6] Defendant correctly notes an exclusion for "wear and tear" and "stock going out of condition." (Ex. 14 at NAI-0163.) But it conveniently disregards the same policy's explicit exception to the exclusion in the equipment breakdown coverage endorsement.

The equipment breakdown endorsement modifies the list of

---

[6] The policy provides, in relevant part, "We insure against risks of direct physical loss unless the loss is excluded or limited in Section 1.B.1." (Section I.A.1.c., Ex. 14 at NAI-0161.) That section - entitled Limitation of Perils - provides, "we insure against risks of direct physical loss except . . . we will not pay for loss, damage or expense caused directly or indirectly by any of the following." (Id. at NAI-0162, -0163.)

10

excluded perils by adding: "But if an equipment breakdown results we will pay for the loss, damage or expense caused by the equipment breakdown."[7] At trial, Nationwide argued that the "wear and tear" and "stock going out of condition" exclusions were exceptions to the equipment breakdown coverage endorsement. The Court finds, as a matter of law, that it is precisely the other way around.

With respect to which is the rule and which is the exception, the language of the endorsement is unambiguous. There is a specific list of excluded perils in the main policy, to which there is a clearly stated exception for losses caused by equipment breakdown. As this language is susceptible of only one reasonable interpretation, the Court finds no ambiguity.

Even if this semantic merry-go-round's whirling is ambiguous, the Court would reach the same result. All extrinsic evidence, including the representations of Mr. Blixt, proves Green Meadow purchased the endorsement to protect itself from losses resulting from equipment failure. Green Meadow uses mechanical equipment to store and maintain its stock in condition. An equipment breakdown

---

[7] The equipment breakdown endorsement provides, in relevant part: "All limitations in the Limitations of Perils [that is, Section I.B.1.] apply <u>except as modified below and to the extent that coverage is specifically provided by this Coverage Extension-Equipment Breakdown.</u>" (Id. at NAI-0330 (emphasis added).) "As respects this endorsement only, the following is added to B.1.b.(1): But if an equipment breakdown results we will pay for the loss, damage or expense caused by the equipment breakdown." (Id.) This endorsement contains no exception for either "wear and tear" or "stock going out of condition."

endorsement which excludes mechanical failure due to "wear and tear," and also bars losses due to "stock going out of condition," would eliminate the very coverage Mr. Chisholm intended to purchase.

The Court turns to the question of whether the loss is, in fact, covered by the endorsement. In contrast to the main policy, the equipment breakdown endorsement is a specified-peril policy. It provides, in relevant part, "we will pay for direct physical damage to Property Covered that is the direct result of an equipment breakdown." (Ex. 14 at NAI-328.) "Equipment breakdown" is defined as "a fortuitous event that causes direct physical damage to covered equipment." The event "must" be one of five listed types, only two of which are relevant here. These are "mechanical breakdown, including rupture or bursting caused by centrifugal force," and "artificially generated electrical current, including electric arcing, that disturbs electrical devices, appliances or wires." (Id.)

Neither the policy nor the endorsement defines "fortuitous." One dictionary defines it as "happening by accident or chance." The Am. Heritage Dictionary (2d Coll. Ed., 1982). Another defines it as "1. A happening that, because it occurs only by chance or accident, the parties could not reasonably have foreseen. 2. An event that, so far as contracting parties are aware, depends on chance." Black's Law Dictionary (8th ed. 2006) at 680. Synonyms

12

include accidental, incidental, contingent, and unexpected. Roget's International Thesaurus at 675 (5th ed. 1992).

While the fan's electrical motor is covered, there remains the question of whether its failure was "fortuitous." The trial evidence proves the fan failed because the electrical contactor failed. Plaintiff argues the failure was fortuitous; defendant, suggesting contactors sometimes get replaced as part of routine maintenance, argues its failure was due to normal wear and tear, rendering it not fortuitous.

The Court finds the evidence supports the conclusion that the contactor was not replaced as part of routine maintenance. If it had been, the fan would have been operable when it was brought to Mr. Kochmann for routine maintenance. All evidence is to the contrary. Mr. Chisholm testified he removed the fan from silo E-5 because it did not operate. Mr. Kochmann testified he tried to start the fan before repairing it, as was his long-time practice. It would not start, however, because the contactor in the fan had burned out, and pieces of the contactor were broken off.

Further, the Court considers the evidence concerning Green Meadow's regular maintenance practices: shortly after Mrs. Chisholm brought the E-5 fan in for repair, another Green Meadow employee brought in two other fans for normal maintenance. When Mr. Kochmann tested them, they started. He then performed routine

13

maintenance on them.[8] From this evidence, the Court finds Green Meadow's regular business practice was to perform regular prophylactic maintenance on its fans, strongly suggesting that had there only been normal wear and tear on the E-5 fan, it would have been serviced and repaired in normal course. That is not what happened here. In this case, the fan stopped cold, and Mr. Kochmann found it was broken.

Defendant's non-expert adjusters reminded the Court that whenever an electrical switch turns on and off, there is an electrical spark or "arcing." This, they suggested, leads to pitting of the sparked surfaces, the very essence of the kind of stress which constitutes normal wear and tear. Their testimony, however, fails to recognize the unique use of these fans: they are used to continuously aerate stored beans - they are only very rarely turned on or off. They are turned on when beans are delivered, and remain on for months or until the silos are emptied. These are not light switches, which may be turned on and off 25 times a day. If working properly, the fans appear to require switching on or off only a minimal number of times a year. The Court finds the fan experienced a mechanical and/or electrical failure.

---

[8]These are the fans which initially confused the claims adjusters over which fan had failed. They were the fans which were not covered by Kochmann's receipt (Ex. 54).

The Court finds the term "fortuitous," is ambiguous as used in the policy. It could define predictable events – such as failure due to normal wear and tear – whose exact timing and nature are unforeseeable; or it could mean extraordinary events which are completely unforeseen. Bearing in mind its obligation to construe the policy so as to resolve all ambiguity against the insurer and not to defeat the reasonable expectations of the insured, the Court finds the failure of the aeration fan contactor - even if caused by wear and tear - was a "fortuitous event" covered by the equipment breakdown endorsement.

The Court is mindful of the second law of thermodynamics.[9] Equipment breaks. This means it is always generally foreseeable that an aeration fan will eventually break down; presumably, that is why Green Meadow arranged for preventive maintenance. But the how, when, why, and results of the breakdown are matters of chance, hence fortuitous. If Nationwide had intended "fortuitous" to exclude equipment failure due to the wear and tear occasioned by ordinary usage, it could have said so specifically. See Cherne Industrial, Inc. v. Grounds & Associates, Inc., 278 N.W.2d 81, 89

---

[9] The second law of thermodynamics states that, in an isolated system, "every process that can possibly occur will go in one direction only, that direction being the one that corresponds to an overall net increase of entropy." 28 The New Encyclopedia Britannica 623, 626 (15th ed. 1998). Put another way, entropy - or disorder - tends to increase. 2 McGraw-Hill Concise Encyclopedia of Science & Technology at 2383 (6th ed. 2009). Pursuant to Fed. R. Civ. P. 201, the Court may take judicial notice of the laws of thermodynamics. Daubert, 509 U.S. at 593, n. 11.

(Minn. 1979). The Court finds the E-5 silo fan's failure is covered by the equipment breakdown endorsement.

Nationwide argues even this determination is not enough. It next argues the equipment breakdown endorsement limits its exposure to $50,000. Again, the Court construes the endorsement's language.

The endorsement provides that, "[u]nless otherwise shown in a Schedule, the following coverages also apply to the direct result of an equipment breakdown. These coverages do not provide additional amounts of insurance." (Ex. 14 at NAI-0328.) The listed "coverages" are "up to $50,000" for (a) the cost of making temporary repairs or expediting permanent repairs; (b) the cost of cleaning up hazardous substances or repairing property contaminated by hazardous substances; (c) spoilage to perishable goods; (d) electronic data restoration; (e) service interruption; and (f) loss of business income. (Id. at NAI-0328 to -0330.)

Green Meadow denies its coverage is limited to $50,000, because a higher limit - $1,000,000 - is explicitly "otherwise shown in a Schedule." This is Nationwide's "Schedule of Blanket Limits By Location," a direct constituent part of the property damage coverage in the main policy. (Id. at NAI-0112; see also Ex. 62.) To obtain this $1,000,000 coverage limit for the E-5 silo's location, Green Meadow reports its quantity of stock every month, as required by the policy. (Id. at NAI-0112.)

Neither the main policy nor the endorsement defines the word

16

"Schedule." There is no dispute that a schedule is a list; the question is whether the policy contemplates a specific schedule, or whether any schedule will do. Nationwide argues the endorsement's use of "Schedule" refers to a specific coverage schedule not purchased by Green Meadow.

The Court is not persuaded. The word "Schedule" in the endorsement is so broad as to be ambiguous. The policy incorporates many schedules, one of which is the "Schedule of Blanket Limits By Location." To acquire the higher coverage limits set forth in the "Schedule of Blanket Limits By Location," Green Meadow was required to submit a monthly inventory of all agricultural products in storage. There is no dispute it complied with this requirement.

Under all these circumstances, the Court finds the term "Schedule," as used in this endorsement, is ambiguous, and must, therefore, be construed against the drafter. If Nationwide claims it required some other kind of schedule, its policy neither identifies it, or defines its constituent parts. The Court finds the equipment breakdown endorsement specifically references parts of the main policy; the two are intended to be read together; and there is no reason, on the face of either document, to conclude that "a Schedule" does not include either the Schedule of Blanket Limits By Location or the monthly inventory. The Court finds Green Meadow has complied with all reporting conditions clearly

17

identified in the policy; as such, it was objectively reasonable for Green Meadow to expect to be able to claim a loss of stock in excess of $50,000, and up to the $1,000,000 limit.

Finally, Nationwide argues Green Meadow failed to comply with the policy conditions by failing to keep the broken contactor. The policy provides, in relevant part, that "[a]s often as we [Nationwide] reasonably require," the insured will "[p]ermit us to inspect the property. Also, permit us to take samples of damaged property for inspection, testing and analysis." (Ex. 14 at NAI-0320.)[10] The question before the Court is whether, by failing to preserve the broken contactor for inspection, Green Meadow failed to "permit" Nationwide to "inspect the property" or "take samples of damaged property" for inspection and analysis. The Court concludes, on the facts of this case, that Green Meadow has complied with its policy obligations.[11]

Bearing in mind the interpretation principles stated above,

---

[10] These conditions are specific to Minnesota and appear in the "Minnesota Changes" section of the policy, which supersedes the corresponding Duties in the Event of Loss set forth at NAI-0176 through -0177.

[11] During the trial, in response to a question by the Court, Mr. Mattson, Hartford Steam's investigator, stated he believed Green Meadow's claim was lost when he learned the contactor was no longer available. Counsel for Nationwide essentially said the same in his closing argument. This argument proves too much. If this were the rule, the insurance policy would need another provision: it would have to require that whether or not any claim might ever be made, the policyholder must never dispose of any defective piece of equipment, lest it categorically deprive him or her of any chance of recovery at a later date.

the Court finds the policy's "permit" and "property" terms are ambiguous. "Permit" is not defined; "Property" is broadly defined and could mean either the fan, the beans, or both. (Ex. 14 at NAI-0160 through -0162.) The evidence is clear: the E-5 silo's fan failed prior to the discovery of the spoilage. Mrs. Chisholm took the fan in for repair before anyone was aware of any loss, let alone an insurance claim. By the time Nationwide asked Green Meadow to obtain or preserve the fan's broken parts, it was too late.

Nationwide's reading of the word "permit" would categorically defeat Green Meadow's reasonable expectations, and must be rejected. The Court finds, as a matter of fact and law, that Green Meadow has complied with its duties in the event of loss. If Nationwide intended "permit" to require the insured to preserve evidence in advance of any claim, this requirement is not stated in the policy. Similarly, if failure to preserve broken equipment parts meant any consequent coverage would be automatically denied, Nationwide could have drafted the policy to say as much. It did not do so.

Nationwide claims it must determine exactly why the contactor failed. The Court does not deny the importance of this information, but the contactor is gone. Nationwide contends its absence amounts to spoliation, which - alone - should void the policy. The Court does not agree. The fan was brought to the

19

repairman in ordinary course. The evidence is uncontested: the first time an odor was detected near the beans was on May 18, after the fan was removed and taken for repair. While this case may have been easier – and might even have been avoided – had the contactor been preserved, there is not the slightest indication that anyone thought it necessary to do so at the time. Instead, it was taken to the repairman who testified he handled it as is his custom: he threw the broken part away unless otherwise instructed. The Court rejects Nationwide's suggestion of spoliation.

III. <u>Order for Judgment</u>

Green Meadow's losses are covered by the policy it purchased from Nationwide. Green Meadow has complied with all conditions precedent to obtaining coverage. Accordingly, the Court finds Green Meadow is entitled to judgment against Nationwide in the amount of $229,477.03, which includes the original claim of $187,285.70, plus $42,191 in prejudgment interest (reflecting 6% interest from July 26, 2006 through the date of trial).

IT IS SO ORDERED.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated: April 8, 2010

<u>s/James M. Rosenbaum</u>
JAMES M. ROSENBAUM
United States District Court